NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 124

No. 2014-207

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Eric K. Manning | May Term, 2015 |

Theresa S. DiMauro, J. (motion to suppress and dismiss);
Michael C. Pratt, J., Specially Assigned (final judgment)

Rosemary M. Kennedy, Rutland County State's Attorney, Rutland, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Anna Saxman, Deputy Defender General,
  Montpelier, for Defendant-Appellant.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.  **DOOLEY, J.**  Defendant Eric Manning appeals the decision of the Superior Court, Rutland Unit, Criminal Division, denying his motion to suppress evidence, including incriminating statements, obtained during a traffic stop.  We affirm.

¶ 2.  The trial court record demonstrates the following facts.  At 1:01 p.m., on August 12, 2013, a uniformed law enforcement officer driving a marked cruiser pulled into the parking lot of the Hannaford Supermarket in Brandon, Vermont.  The officer observed a vehicle parked in the back lot, in the area farthest from the building, where neither patrons nor employees typically park.  The back parking lot is known for drug activity, and law enforcement officers often patrol the area.  The officer parked his cruiser facing the vehicle but not blocking it in.  He

ran a registration check on the vehicle and discovered the license of the registered owner, defendant, was under suspension.

¶ 3. The officer exited the cruiser and approached the vehicle with the intention of verifying the identity of the individual in the driver's seat and informing him that his license was suspended. As the officer approached the vehicle, he observed defendant "shuffle something with his right hand towards the middle of the console area."[1] The officer walked toward the passenger side of the vehicle and confirmed the name of defendant and that he was the registered owner of the vehicle. The officer saw a prescription bottle partially hidden under a green shirt between the driver and passenger seats. The officer believed the bottle may have been the item defendant was shuffling around as he approached the vehicle. The officer then asked defendant for his identification and license. Defendant pulled out his wallet, which the officer observed was filled with "an excessive amount of cash just shoved in his wallet and literally falling out of his pockets"; the bills were "scattered around, folded, [and] crunched."[2] Defendant's hands were "shaking rapidly," and he was unable to produce his identification. At this point, the officer asked if he could hold the prescription bottle, which defendant handed to him. The

---

[1] The officer first testified that defendant "started to shuffle something when he saw me." During cross-examination, when asked if defendant had noticed him approaching the vehicle when he "shuffled" something in the front seat, the officer responded, "I can't tell you if he saw me or not." When asked at what point he was certain defendant saw him, the officer responded that it was the point he asked, "Are you Eric?" The trial court found that defendant noticed the officer's approach and then began shuffling something in the console area. Defendant does not expressly challenge the court's finding on appeal but does note in his brief to this Court: "[The officer] was not even sure if [defendant] saw him approaching. He testified that [defendant] was looking down at his phone texting with both hands as he walked up to the car. Shuffling under these circumstances does not indicate that a person is committing a drug related crime." We do not read this statement as a claim that the trial court's finding of fact is unsupported. Thus, we are bound by the court's finding of fact. See V.R.A.P. 28(a)(3),(4)(A) (setting out requirements for appellant's brief, including statement of "specific claims of error" and argument containing "issues presented, how they were preserved, and appellant's contentions and reasons for them").

[2] Defendant disputes the court's finding that the amount of cash was "excessive" because the officer testified that he did not know how much money defendant had on him. Based on the officer's description of what he saw, it was not unreasonable for the court to find the amount of money excessive. We recognize, however, that "excessive" is a relative and vague term. In any event, this fact does not impact our analysis.

2

officer briefly looked at the bottle, noticed the label was "completely worn" and "faded," and placed the bottle on the roof of the car. The officer then asked defendant where he had come from and why he was in the parking lot. Defendant said he was waiting for a friend so that he could give her a ride to a job interview and that he was not aware his license was suspended. The officer asked defendant if he would exit the vehicle and sit on the hood of the car. Defendant complied, and the officer returned to the cruiser and ran a warrant check on defendant, finding no outstanding warrants. The entire interaction up to this point occurred within roughly three minutes of the officer's approach.

¶ 4. When the officer returned to defendant's vehicle, he asked defendant what was in the bottle and if defendant had a prescription. Defendant said it was anxiety medication but could not remember what it was called, and he gave the names of both his therapist and his doctor. The officer asked defendant how long he had the bottle, to which defendant responded that he had it for "a little while." The officer asked "what's in the bottle because when I shake the bottle there's nothing moving, but when I look through it there's plastic baggies in there. . . when I get a bottle from the doctor, they don't individualize it, do they?" Defendant responded "Why don't I just give you permission to open it." The officer replied "You're going to give me permission to open it? That would be great. What else is in the car because when I walked over here I know I saw you shove that bottle right in between the car seat?" Defendant responded that he was covering his soft drink bottle so that it would not get hot. The officer asked defendant additional questions about his whereabouts, his reason for being in the supermarket parking lot, and his criminal past. The officer eventually brought the bottle back to his cruiser, opened it, and found a white powdery substance later identified as cocaine. Roughly ten minutes elapsed from the officer's first approach to his opening the bottle.

¶ 5. The officer returned to the vehicle and questioned defendant further about the substance in the bottle: what defendant thought was in the bottle and how much he thought it

contained. After roughly ten more minutes of questioning, the officer arrested defendant and searched him incident to the arrest. During the search, defendant admitted that in his right front pocket he had another prescription bottle, which he stated contained Klonopin and another anxiety medication. The bottle, which contained multiple types of pills and was labeled with a name other than defendant's, was seized. The search also revealed more plastic bags containing cocaine. Defendant was transported to the Brandon Police Department where he was advised of his Miranda rights.

¶ 6. Defendant was charged with possession of cocaine. He moved to suppress the evidence obtained during the investigative detention, arguing that it was the result of an unlawful search and seizure that exceeded the scope of the suspended license investigation in violation of the Fourth Amendment to the U.S. Constitution and Chapter I, Article 11 of the Vermont Constitution. He also moved to suppress statements made before the officer advised him of his Miranda rights, arguing that the questioning outside his vehicle amounted to a custodial interrogation. On February 27, 2014, the trial court held a motion hearing, at which it heard testimony of the officer.

¶ 7. In a May 27, 2014 written order, the court denied defendant's motion. The court concluded that the encounter did not amount to a seizure because it "was not so intimidating that a reasonable person would not feel free to leave without responding to the officer's requests." The court also concluded that defendant was not in custody, and therefore not entitled to Miranda warnings, because the encounter occurred in broad daylight in a public parking lot, only a single officer was present, defendant's vehicle was not blocked in by the cruiser, and defendant's freedom of movement was not otherwise restrained. This appeal followed.

¶ 8. Defendant renews his claims on appeal. With respect to the Fourth Amendment and Article 11, defendant claims that he was unlawfully seized without reasonable suspicion and that his consent to search the prescription bottle was tainted by this unlawful seizure. With

4

respect to <u>Miranda</u>, defendant claims that he was subject to a custodial interrogation without being advised of his constitutional rights.

¶ 9. Before turning to defendant's specific claims, it is important that we clarify what is being argued and what we are deciding in this appeal. Defendant argues that the point at which he was seized was when the officer ordered him out of his vehicle.[3] The State's position is that this seizure was lawful because the officer had reasonable suspicion based on the presence of the prescription bottle and other factors, which we discuss in greater detail below. As noted above, however, the trial court concluded that defendant was not seized because the entire encounter remained consensual; as such, the court did not consider the sufficiency of the officer's reasonable suspicion. While we agree with defendant, rather than with the trial court, that he was seized upon exiting the vehicle, we believe that the officer had reasonable suspicion for the exit order and subsequent questioning about the prescription bottle. We therefore affirm the trial court but on a separate ground. See <u>State v. Guzman</u>, 2008 VT 116, ¶ 10, n.3, 184 Vt. 518, 965 A.2d 544 (explaining this court can affirm on different grounds "if the record supports it").

¶ 10. When reviewing the trial court's decision on a motion to suppress, we review the court's legal conclusions de novo and its factual findings for clear error. <u>State v. Hinton</u>, 2014 VT 131, ¶ 8, ___ Vt. ___, 112 A.3d 770.

¶ 11. We start with defendant's Fourth Amendment and Article 11 claims, briefly reciting the applicable background law. The Fourth Amendment to the U.S. Constitution and

---

[3] Defendant stated in a supplemental motion to the trial court that "he does not concede that his sitting in the driver's seat of the suspected vehicle, by itself, provides reasonable and articulable suspicion that a crime or traffic violation is taking place." Defendant appears to have abandoned this argument on appeal, and we therefore do not address it.

Chapter I, Article 11 of the Vermont Constitution[4] protect citizens against unreasonable searches and seizures. U.S. Const. amend. IV (providing that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Vt. Const. ch. I, art. 11 (providing that "the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure"); see State v. Berard, 154 Vt. 306, 309, 576 A.2d 118, 120 (1990) (noting that Article Eleven imports "reasonableness" standard of Fourth Amendment). In Terry v. Ohio, 392 U.S. 1, 27-29 (1968), the U.S. Supreme Court articulated an exception to the probable cause requirement for seizures that are limited in their scope and duration and do not rise to the level of full arrests. Such an intrusion must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," and cannot be based on the officer's "inchoate and unparticularized suspicion or 'hunch.' " Id. at 21, 27; see State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280 ("The officer must have more than an unparticularized suspicion or hunch of criminal activity, but needs considerably less than proof of wrongdoing by a preponderance of the evidence.").

¶ 12. It is well established that an officer's reasonable suspicion of a traffic violation can form the basis for a lawful stop,[5] State v. Lussier, 171 Vt. 19, 34, 757 A.2d 1017, 1029 (2000), so long as the detention is temporary and lasts no longer than is "necessary to effectuate the purpose of the stop," State v. Sprague, 2003 VT 20, ¶ 17, 175 Vt. 123, 824 A.2d 539. If, during the course of the investigative stop, an officer gathers additional information providing reasonable suspicion that some other criminal act is occurring, the officer may extend the detention to investigate that activity, State v. Cunningham, 2008 VT 43, ¶ 15, 183 Vt. 401, 954

---

[4] With the exception of the law on exit orders, addressed below, defendant has not presented any argument that Article 11 provides any greater protections than the Fourth Amendment. We therefore consider Article 11 only in relation to the exit order.

[5] The term "stop" here is shorthand for a seizure that is limited in scope and duration.

A.2d 1290, and may order an individual to exit the vehicle, Sprague, 2003 VT 20, ¶ 20.[6] "In determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing." Lussier, 171 Vt. at 23-24, 757 A.2d at 1020. That an officer's true motivation for stopping a vehicle or approaching an individual is to investigate drug possession or other criminal activity has no bearing on the legality of the detention, so long as, from an objective standpoint, the officer had reasonable and articulable suspicion of a traffic or other violation.

¶ 13. Defendant does not contest on appeal the validity of the initial suspended license investigation. Rather, he claims that the officer unlawfully expanded the scope of the license investigation by ordering defendant out of his vehicle and questioning him about his prescription bottle without reasonable suspicion.

¶ 14. In determining whether an officer had reasonable suspicion to effectuate a seizure or extend an investigative detention, we look at the totality of the circumstances. State v. Dunham, 2013 VT 15, ¶ 8, 193 Vt. 378, 67 A.3d 275; see also United States v. Arvizu, 534 U.S. 266, 273 (2002) ("[W]e have said repeatedly that [courts] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." (quotations omitted)). The totality-of-the-circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 523 U.S. at 273 (quotation omitted). Although each factor in the analysis in isolation may be consistent with innocent behavior, the factors taken

---

[6] Vermont's law with respect to exit orders during routine traffic stops departs from the law under the Fourth Amendment. Sprague, 2003 VT 20, ¶ 19. We have interpreted Article 11 of the Vermont Constitution as requiring the officer's reasonable belief that the exit order was required to protect the safety of the officer or another or to investigate a suspected crime. Id. ¶ 20.

together can form the basis for reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9 (1989). As such, courts must avoid a "divide-and-conquer analysis" that scrutinizes each factor independently and accords no weight to conduct that alone is fairly innocuous. See Arvizu, 523 U.S. at 274. Similarly, conduct that would appear ordinary in one context may appear suspicious in an entirely different context. Id. at 275-76 (concluding that acts of "slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer" may be "unremarkable" in busy urban context but "quite unusual" on remote desert highway).

¶ 15. Although we review the trial court's conclusions with respect to reasonable suspicion de novo, we nonetheless consider the training and expertise of the officer in drawing inferences from the individual facts and circumstances. Ornelas v. United States, 517 U.S. 690, 699 (1996) (holding that reasonable suspicion determinations should be reviewed de novo but emphasizing that "a reviewing court should take care . . . to give due weight to inferences drawn from [the] facts by . . . local law enforcement officers"). Here, the officer obtained the following information during the course of the suspended-license investigation: (1) defendant was sitting in his car in an area of a parking lot known for drug activity; (2) defendant made furtive movements as if shuffling an object in the front seat of the car when he saw the officer approaching; (3) the object defendant appeared to hide from the officer was a prescription pill bottle with a worn label; (4) defendant was nervous and shaking when asked for his identification; and (5) defendant's wallet contained a large amount of crumpled bills.

¶ 16. Defendant is correct that none of these factors viewed in isolation could form the basis for reasonable suspicion, but focusing on each factor individually undercuts the totality-of-the-circumstances analysis. Arvizu, 523 U.S. at 274-75. Looking at the circumstances as a whole, particularly through the lens of the officer's experience in law enforcement, the officer had reasonable suspicion to believe that defendant was in possession of illegal drugs.

¶ 17.   The officer testified that he believed the object defendant was trying to conceal from him was a prescription bottle—a bottle that appeared old and had a worn label.   And although the mere presence of a prescription bottle is not itself objectively suspicious, courts have acknowledged that, in certain contexts, a pill bottle may add to the calculus.[7]   See, e.g., May v. State, 77 So. 3d 831, 835 (Fla. Dist. Ct. App. 2012) (stating that passing pill bottle between individuals is sufficient reasonable suspicion even if pills are not actually seen); Richardson v. State, 402 S.W.3d 272, 277 (Tex. Ct. App. 2013) (concluding that officer had reasonable suspicion based upon several factors, including defendant's parking too close to fog line, nervousness, and possession of empty pill bottle); Collins v. State, 854 P.2d 688, 697-98 (Wyo. 1993) (concluding that officer had reasonable suspicion based on several factors, including defendant's nervousness, his possession of pill bottle with different name, and presence of object hidden up his sleeve with handle sticking out).

---

[7]   In support of his argument that the presence of the prescription bottle did not provide reasonable suspicion for the officer to expand the scope of the investigation, defendant relies on several cases that consider the reasonableness of seizing contraband during a protective patdown. These cases are inapposite.  For example, in Minnesota v. Dickerson, 508 U.S. 366 (1993), the U.S. Supreme Court reaffirmed that, within the permissible bounds marked by Terry, an officer may conduct a protective patdown—not to discover evidence of a crime—but for the limited purpose of determining if a suspect is armed.  Id. at 373.  The officer in Dickerson exceeded the bounds of Terry when, during a patdown, he felt a small lump in the defendant's front pocket. The officer was able to identify the lump as crack cocaine only after manipulating it with his fingers.  The Supreme Court analogized the circumstances to the "plain-view doctrine" and held that an officer may not seize objects felt during a protective patdown unless their incriminating nature is immediately apparent.  Id. at 378-79.

As the Court in Dickerson noted, when conducting a legitimate Terry search of the interior of an automobile, an officer may seize any contraband left in plain view if the contraband's incriminating character is immediately apparent.  Id. at 374; see Michigan v. Long, 463 U.S. 1032, 1049-50 (1983).  Here, however, the officer never seized defendant's prescription bottle; defendant voluntarily handed the bottle over to the officer and later gave the officer permission to open it.

Defendant appears to conflate the need for probable cause if the contraband is not in plain view during a Terry stop and the requirement of reasonable suspicion in questioning a defendant about possible contraband during an investigative detention.  The issues we are resolving here are whether the officer had reasonable suspicion to question defendant about his pill bottle and whether defendant's consent for the officer to seize and search the pill bottle was voluntary.

¶ 18. Moreover, the act of concealing something in the presence of a law enforcement officer weighs heavily in the calculus. See, e.g., United States v. Brown, 765 F.3d 278, 290 (3d Cir. 2014) (finding reasonable suspicion where defendant, who was parked in high-crime area, made furtive movements consistent with concealing firearm); State v. Deck, 994 S.W.2d 527, 535 (Mo. 1999) (finding reasonable suspicion where defendant's reaction to encounter with officer was to turn away and reach down toward passenger side of vehicle as if reaching for or attempting to hide something); State v. Armstrong, 659 N.E.2d 844, 848 (Ohio Ct. App. 1995) (recognizing that furtive movements alone do not provide reasonable suspicion but stating that when considered with other factors, such as officer's experience and familiarity with area, may indicate attempt to conceal weapon or drugs); State v. Clink, 348 P.3d 1187, 1190 (Or. Ct. App. 2015) (emphasizing defendant's furtive movements, as if trying to conceal weapon, as contributing to reasonable suspicion).

¶ 19. One case that lends support to our conclusion here is United States v. Edmonds, 240 F.3d 55 (D.C. Cir. 2001). In Edmonds, the D.C. Circuit affirmed the lower court's conclusion that there was reasonable suspicion where the defendant having parked after hours in an area known for drug transactions; defendant's " 'furtive gestures,' " as if attempting to conceal an item under the driver's seat; and the fact that another man, upon observing the officer, fled and entered the van where defendant was seated. Id. at 58. In assessing each of the circumstances, the court placed significant weight on defendant's furtive movements, stating that when such movement occurs in the presence of an officer it can form the basis for reasonable suspicion. Id. at 61. In analogizing the facts of Edmonds to those here, we note that, like the suspect in Edmonds, defendant was parked in an area known for drug activity. And although defendant was not sitting in the supermarket lot after hours, he was parked in an area not typically used by either customers or employees. Further, the officer here personally identified the object he perceived defendant was attempting to conceal as a prescription bottle with a worn

10

label. The officer's subsequent focus on that specific bottle was reasonable in light of the attendant circumstances.

¶ 20. We also note that the circumstances here are distinguishable from those cases where we have not found reasonable suspicion. For example, in State v. Cunningham, the officer had little more than the defendant's nervousness, his prior criminal record, and the fact that the defendant, a resident of Middlebury, could not explain why he was in Vergennes that day. 2008 VT 43, ¶¶ 22-26, 183 Vt. 401, 954 A.2d 1290. We explained that general nervousness and a prior criminal record add little weight to any reasonable-suspicion calculus, and we also emphasized that the defendant "was simply present—openly and in broad daylight—on a public thoroughfare in a town about fifteen miles from his home. That he told the officer that there was 'no particular reason' he was there does not bear any weight in establishing a reasonable suspicion of criminal activity." Id. ¶ 26.

¶ 21. In State v. Paro, 2012 VT 53, 192 Vt. 619, 54 A.3d 516 (mem.), we held that the officer lacked reasonable suspicion to stop a vehicle idling in a parking lot at night in an area that had experienced recent burglaries. Id. ¶ 11. In support of our conclusion, we addressed several earlier cases from this Court in which cars were observed overnight in areas of recent criminal activity or in areas where the cars were otherwise out of place. Id. ¶¶ 7-12. We stressed that in each of these cases, as in Paro, neither the vehicles nor the individuals were "doing anything illegal or inherently suspicious." Id. ¶ 8.

¶ 22. It is clear that the officers in the Cunningham and Paro were acting on little more than a hunch. By contrast, the officer here observed behavior that his training and experience suggested was suspicious, particularly given the location of defendant's car in an area known for drug activity. We therefore conclude that the officer gathered enough reasonable suspicion in his encounter with defendant to expand the scope of the suspended-license investigation into a drug investigation. This reasonable suspicion permitted the officer to ask defendant to exit his vehicle

11

and interview him about the contents of the prescription bottle. See Sprague, 2003 VT 20, ¶ 20. Because we conclude that the officer had reasonable suspicion and did not act unlawfully, defendant's consent was not tainted. See id. ¶ 32 (stating that illegality of search taints defendant's consent); State v. Zaccaro, 154 Vt. 83, 88, 574 A.2d 1256, 1259 (1990) (stating that consent is voluntary if not result of duress or coercion).

¶ 23.    Finally, we turn to defendant's Miranda claim. In Miranda v. Arizona, 384 U.S. 436 (1966), the U.S. Supreme Court held that, prior to engaging in a custodial interrogation, law enforcement officers must advise suspects of their right to remain silent and right to have an attorney present. Id. at 444-45. As the Supreme Court explained, Miranda warnings are triggered only when a suspect is subject to a custodial interrogation—i.e., "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. We previously have stated that the inquiry into whether an action rises to the level of a custodial interrogation is an objective one that is based on the totality of the circumstances. State v. Sullivan, 2013 VT 71, ¶ 28, 194 Vt. 361, 80 A.3d 67.

¶ 24.    In Sullivan, we outlined the factors identified by the U.S. Supreme Court to be considered in determining whether a suspect is in custody: (1) the location of the questioning; (2) the officer's belief in the suspect's guilt, if that belief is conveyed to the suspect; (3) whether the suspect came to the interview voluntarily; and (4) whether a reasonable person would feel free to leave. Id. ¶ 29. We also listed several other factors that aid our analysis:

> The extent to which the suspect was confronted with evidence of guilt; whether and to what degree the suspect's freedom of movement was restrained; whether the police used deceptive techniques in conducting the interview; the degree to which the suspect was isolated from the outside world; the duration of the interview; whether the police officers were armed; and the number of police officers during the interview.

<u>Id.</u> (alteration omitted) (quoting <u>State v. Muntean</u>, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518). We also have emphasized that the most important factor, although not determinative, is whether the officer told the suspect that he or she was free to leave. <u>Id.</u> As we explained in <u>Muntean</u>, "[t]here is no exhaustive list of criteria that can be considered in making the custody determination, nor is there one particular factor that must be considered in every case." 2010 VT 88, ¶ 19.

¶ 25. We also have set out a number of factors for determining whether a de facto arrest has occurred: the amount of force used, whether a weapon was displayed, whether the defendant was suspected of being armed, the physical treatment of the defendant, the extent that freedom of movement was restrained, the duration of the stop, and the number of officers. See <u>State v. Chapman</u>, 173 Vt. 400, 403, 800 A.2d 446, 449 (2002).

¶ 26. Defendant argues that the officer should have advised him of his <u>Miranda</u> rights because when the officer "ordered [him] out of the vehicle and interrogated him about his prescription bottle" it amounted to a "de facto" arrest. Defendant's description of the circumstances exaggerates the evidence. The trial court found that the officer neither made a formal arrest nor restrained defendant equal to that of a formal arrest until after defendant responded to the officer's questions. Defendant particularly emphasizes the exit order, which occurred relatively early in the interaction, before the officer opened the pill bottle. The "order" was phrased as a request however, which defendant honored. None of the factors outlined above, <u>supra</u>, ¶ 22-23, suggest that a de facto arrest occurred when defendant exited his vehicle. We cannot conclude that the officer imposed restraint of a degree equal to an arrest before the officer opened the bottle and found the cocaine.[8]

---

[8] We recognize that the officer did eventually formally arrest defendant and give <u>Miranda</u> warnings. Because defendant argues that the warnings should have been given before any interrogation commenced, we do not consider whether the warnings were otherwise too late.

13

¶ 27. Looking more broadly at the question of whether defendant was subjected to custodial interrogation, the location of the interrogation is a significant factor in the totality-of-the-circumstances analysis, and we emphasize that the interrogation here occurred outside in broad daylight in a public parking lot, not in a police cruiser, State v. Sole, 2009 VT 24, ¶ 18, 185 Vt. 504, 974 A.2d 587, at the police station, Muntean, 2010 VT 88, ¶ 21, or in any other confined space, State v. Brooks, 2013 VT 27, ¶ 16, 193 Vt. 461, 70 A.3d 1014 (holding cell). Additionally, defendant's freedom of movement was not restrained. The officer asked defendant if he would sit on the hood of his car, but he did not order him to do so and made no indication that compliance was required. Although the officer was armed and in uniform, he was the only officer on the scene. Finally, the interview lasted only around ten minutes, and there is no evidence that the officer used any deceptive or otherwise coercive interrogation techniques.

¶ 28. Defendant places great weight on the fact that the officer never informed him that he was free to leave. As we discussed in Sullivan, a suspect's freedom of movement; the fact that the questioning occurs in an open or public place, not isolated from the outside world; and the short duration of the questioning are all important considerations in determining whether a suspect feels free to leave. 2013 VT 71, ¶¶ 30-35. Under such circumstances, the fact that an officer does not specifically advise a suspect that he or she is free to leave does not automatically turn the questioning into a custodial interrogation. We therefore conclude that, based on the totality of the circumstances, defendant was not in custody and was not entitled to Miranda warnings. The trial court did not err in denying defendant's motion to suppress.

Affirmed.

FOR THE COURT:

_____
Associate Justice